## WILSON *v.* WHITE.

1. PRINCIPAL AND AGENT—AGENT TO BUY FOR PRINCIPAL MAY NOT BUY FOR HIMSELF.

   An agent employed to purchase real estate for his principal may not purchase it for himself without the consent of his principal.

2. SAME—PRINCIPAL WHO CONSENTS TO AGENT'S BUYING FOR HIMSELF MAY NOT ASSERT CLAIM THERETO.

   Where the members of a syndicate owning a large tract of timber land in the South had knowledge that their agents, who had no power to buy or sell land for the syndicate without the consent of all the members, were buying land in their own names and for their own benefit,

---

On right of broker to purchase real estate listed with him for sale, see notes in 20 L. R. A. (N. S.) 1158; L. R. A. 1915E, 976; L. R. A. 1918F, 790.

As to what constitutes an account stated, see notes in 27 L. R. A. 811; 45 L. R. A. (N. S.) 534.

and tacitly consented thereto, they are in no position several years later, when the land is sold at a profit, to claim that such purchases were made in the interest of the syndicate.

3. SAME—NOTICE—LACHES—WAIVER.
   Delay for nearly six years by members of a syndicate owning a large tract of land in asserting their rights to land purchased by their agents with their own money, in their own names, and for their own benefit, after notice thereof, amounted to laches precluding them from now claiming any rights therein.

4. SAME—FRAUD—ACCOUNTING.
   The finding of the court below that in the rendering of monthly reports by the agents and in accounting to the syndicate for its money passing through their hands, there was no fraud, *held*, supported by the record.

Appeal from Wayne; Webster (Clyde I.), J. Submitted January 26, 1922. (Docket No. 83.) Decided July 19, 1923. Rehearing denied October 1, 1923.

Bill by Samuel A. Wilson against Chester G. White and others to enjoin the distribution of certain money and bonds arising from the sale of timber land. Defendants filed a cross-bill for an accounting. From a decree for plaintiff, certain defendants appeal. Affirmed.

*Anderson, Wilcox, Lacy & Lawson* and *Lucking, Helfman, Lucking & Hanlon* (*Arthur J. Lacy, Harold W. Hanlon* and *Edwin C. Page,* of counsel), for plaintiff.

*Geer & Martin, Humphrey, Grant & Humphrey,* and *Floyd A. White,* for defendants appellants.

*Campbell, Bulkley & Ledyard* (*Charles H. L'Hommedieu* and *Selden S. Dickinson,* of counsel), for defendant appellee.

BIRD, J. This is a controversy which grows out of

a division of the proceeds of a sale of pine lands in the State of Alabama, which were owned for several years by the parties hereto or their grantors.    In 1883, seven men, who were connected by blood and business relations, got together and purchased a tract of pine land in Alabama as an investment.    The tract contained 57,520 acres and was about 40 miles in length, and from 2 to 10 miles in width.    The tract was a railway land grant to the Mobile & Montgomery Railway, and was located on alternate sections on either side of the railway.    The purchase price was $71,550 or $1.25 an acre.

The group or syndicate who purchased the land styled themselves the "Michigan Land Company," for the purpose of buying, selling and trading in pine lands in Alabama.    The company was not incorporated, neither was it a copartnership.    The parties had no written agreement between themselves.    They purchased the land and it was deeded to them and they took it as tenants in common.    The title to these lands was owned in the following proportions by the members of the syndicate: Chester G. White, an undivided one-third interest; Justin Wentworth and George K. Wentworth, each an undivided one-twelfth interest; David G. Slafter, an undivided one-sixth interest; William Henry Wilson, an undivided one-ninth interest; Farwell A. Wilson, an undivided one-ninth interest, and William Hotchkiss Wilson, an undivided one-ninth interest.

After the purchase was perfected it became necessary to have an agent on the tract, and the syndicate appointed Amos Chapman as their agent to go to Alabama to look after the lands, protect them against fire, pay taxes, eject trespassers, etc.    He represented the syndicate in Alabama until 1896, when he died. Mr. Chapman was succeeded by William Hotchkiss Wilson, a member of the syndicate.    His duties and

authority were the same as Chapman's had been. Mr. Wilson continued in this position until 1903, when his health failed, and he returned to the north and was succeeded by his son, Samuel A. Wilson, the plaintiff herein, who went to Alabama and represented the syndicate until the lands were sold in 1911 to the Alger-Sullivan Lumber Company for $2,000,000. The syndicate had no written agreement with any of the agents.

During the time Chapman acted as agent for the syndicate he bought some lands for the syndicate and also bought several thousand acres for himself. While his successor, William Hotchkiss Wilson, acted as agent, he bought a small acreage for the syndicate, and also purchased lands for himself, for his wife and for his son, Samuel, the plaintiff herein. Samuel A. Wilson, who succeeded his father, purchased quite a large quantity of land for the syndicate, but very little for himself.

It is over the purchase of these individual lands by William Hotchkiss Wilson and Samuel A. Wilson that this trouble arose. At the time the sale of the lands was effected in 1911, William Hotchkiss Wilson was then the owner of 790 acres, his wife Amelia, 143 acres, and his son Samuel A. Wilson, 1,220 acres. Before the sale to the Alger-Sullivan Lumber Company took place, the members of the syndicate induced William Hotchkiss Wilson, Amelia Wilson and Samuel A. Wilson to include their individual lands with those of the syndicate, and all was disposed of in the sale and included in the consideration.

When the bonds and cash were turned over by the Alger-Sullivan Lumber Company in payment of the lands Chester G. White, who acted as treasurer for the syndicate, paid plaintiff $10,000 to apply on account, but subsequently refused to pay over to him the balance of the cash payment due him, and refused

to deliver any of the bonds to him, under the claim that the syndicate was entitled to the increase in the value of his lands, because he was employed as agent for the syndicate and could not purchase lands for himself, and a like claim was made as to the lands purchased by William Hotchkiss Wilson for himself and those he purchased for his wife, Amelia.

Confronted with this situation plaintiff, Samuel A. Wilson, filed his bill in the Wayne circuit court setting up the facts and praying for an injunction, restraining defendant Chester G. White from making any further distribution of the cash payment of $500,000, and the same relief was asked against the defendant, the Union Trust Company, from making any distribution of the 1,500 one-thousand-dollar 5% bonds until the matters of difference between him and the syndicate members were disposed of.    After a restraining order was issued, agreeable to the prayer of the bill, the parties, by stipulation, opened the way for a further distribution of cash and bonds, so that only a portion of the cash and bonds is still held by the trustees to await the outcome of this litigation.

The syndicate members answered the bill, set up affirmative matter and claimed the benefit of a cross-bill, in which they claim, in substance, that William Hotchkiss Wilson and his son, Samuel A. Wilson, were agents of the syndicate to look after said lands, and that while such agents they had no right to buy lands adjacent to or interspersed with their lands, and that the syndicate was entitled to the increase on the 2,153 acres of individual lands purchased by the Wilsons for themselves.

They further claim that William Hotchkiss Wilson and Samuel A. Wilson were, while acting as agents for said syndicate, guilty of sundry and divers frauds in their dealings with and for the syndicate, in that their monthly reports and accounts were not true re-

ports and accounts; that they took title to lands bought with syndicate money and retained the title; that they purchased lands for the syndicate and charged the syndicate more than they paid therefor, and many other charges of fraud along the same line, and they pray therein for an accounting and a decree for the sums retained.

The parties went to a hearing, and after a long and tedious trial lasting about four months, the chancellor made a very able and painstaking finding of facts and then expressed his legal conclusions thereon. While it was found that William Hotchkiss Wilson and Samuel A. Wilson purchased lands for themselves while they were the agents of the syndicate, it was also found that the purchases by them were known to the syndicate and acquiesced in by them, and further that it was the general policy of the syndicate to permit members of the syndicate, as well as the agents of the syndicate, to make such purchases on their own account as they saw fit.

It was also found by the chancellor that there was no evidence of fraud upon the part of either William Hotchkiss Wilson or Samuel A. Wilson, and that their monthly accounts submitted to the syndicate were examined and approved by them and became accounts stated, and further that if the syndicate did not have knowledge of the purchases prior to 1906 they were apprised of them at that time, and neglected to take any steps to assert their rights, and that such neglect upon their part amounted to laches, which would preclude them from raising the questions at this time. With these holdings the relief prayed by plaintiff was granted and defendants' cross-bill was dismissed.

1. The important questions to be considered are:

(a) Was the agency of William Hotchkiss Wilson and Samuel A. Wilson of such a character as to preclude them from purchasing lands for themselves?

(*b*) Were William Hotchkiss Wilson and Samuel A. Wilson, or either of them, guilty of fraud in his dealing with the syndicate and in the rendition of his monthly accounts?

It is a principle, well settled in the law, that an agent employed to purchase real estate for his principal may not purchase it for himself without the consent of his principal. *Moore* v. *Mandelbaum*, 8 Mich. 433; *McNutt* v. *Dix*, 83 Mich. 328 (10 L. R. A. 660) ; *Green* v. *Knoch*, 92 Mich. 26; *Hogle* v. *Meyering*, 161 Mich. 472; *Hutton* v. *Sherrard*, 183 Mich. 356 (L. R. A. 1915E, 976).

In the last named case it was observed that:

> "It is a general rule of law that an agent for the selling of property may not sell it to himself. *McNutt* v. *Dix*, 83 Mich. 328 (10 L. R. A. 660) ; *Green* v. *Knoch*, 92 Mich. 26. The reason why public policy has so decreed is to prevent the selfish interest of the agent from coming in conflict with his duty to his principal. In all transactions where the agent's loyalty is liable to be affected by his selfish interest, the general rule will apply even though no fraud is practiced. *McKay* v. *Williams*, 67 Mich. 547 (11 Am. St. Rep. 597)."

Cyc. states the rule in this wise:

> "For the same reason, an agent authorized to purchase property for his principal must not, except with the principal's full knowledge and consent, purchase the property from himself, either directly or indirectly; and in accordance with this rule, an agent employed to purchase cannot purchase the property for himself and then resell it to the principal at an advance. If the agent is guilty of wrongdoing in this respect the principal, when he acquires knowledge of the facts, may, at his election, avoid the transaction, whether the agent acted fraudulently or not; or he may compel the agent to account for any excess he received above the real value of the property." 31 Cyc. p. 1440.

Warvelle, in his work on Vendors, volume 1 (2d

Ed.), § 226, in discussing this subject has the following to say:

"In accordance with the foregoing rule it has been held that an agent cannot become the purchaser of property confided to his care, and that a purchase made under such circumstances carries fraud upon its face.    But this, perhaps, is carrying the application of the rule to extreme length; for the true spirit and meaning of the rule is that the agent shall not so act toward the subject of the agency for his own benefit as to work injury to his principal.    He will not, therefore, be allowed to purchase where he has a duty to perform which is inconsistent with the character of purchaser, nor to speculate for his private gain with the subject-matter committed to his care.    This may be regarded as the true extent of the rule; and an agent placing himself beyond it may lawfully contract with his principal with relation to the property."

Mechem on the Law of Agency makes this comment:

"An agent instructed to purchase property for his principal, and relied upon to buy it in the principal's name and for his direct account, will not be permitted, without his principal's knowledge and consent, to become the purchaser of the same property for himself. If the property be land and is purchased with the principal's money, the agent will clearly be a trustee; and even though he purchased with his own money, he will, nevertheless, be considered as holding the property in trust for his principal, and the latter, upon repaying or tendering him the amount of the purchase price and his reasonable compensation, may, by proper proceeding in equity, compel a conveyance to himself."    1 Mechem on Agency (2d Ed.), § 1192.

What were the duties of William Hotchkiss Wilson and Samuel A. Wilson, under their contract of employment?    The record shows that the duties of Amos Chapman, the first agent, were to look after the surveying, trespassing, fires, cyclones, titles, land valuations and to collect money when the land was sold and send it north for division.    His general

authority was limited to the doing of these particular things. If he wanted to buy, trade or sell for the syndicate he had to get special authority. The majority rule did not prevail in the syndicate, and before the agent could buy or sell he had to get the consent of each member of the syndicate. These, in the main, were the duties of Amos Chapman. Mr. White, who was treasurer of the syndicate, testified that the duties of William Hotchkiss Wilson and Samuel A. Wilson were the same as those of Chapman. And the answer of defendant also admits that the duties, powers and authority of Samuel A. Wilson were the same as those of his father, William Hotchkiss Wilson.

From the character of the employment of the Wilsons as agent, I am in serious doubt whether the agency was such that the foregoing rule of law should be applied. The Wilsons, as agent, had no express or implied duty to purchase or sell real estate. They were not sent there with any such authority. The only way they could buy was after they had the individual consent of each member of the syndicate, and then only as to some particular piece of property. The Wilsons had no general discretion to exercise as to what piece should be bought, or what price should be paid, except as expressly given. The syndicate never delegated that general authority to anyone, but each reserved the right to decide for himself whether he would consent or refuse to purchase or sell. During the latter part of the time Samuel A. Wilson served, the rule was somewhat relaxed as to trades, but during that period Samuel A. Wilson bought no lands for himself. The most of his lands were purchased before he became the agent of the syndicate.

But waiving this question and assuming that the employment was such as to make the foregoing rule of duty applicable, did the individual purchases by

the Wilsons violate this rule of duty? The testimony in this case convinces us that the syndicate knew that the Wilsons were purchasing individual lands and consented thereto. It would be difficult, indeed, for one to read this record and reach any other conclusion. During most of the time from 1896 to 1902, during the incumbency of William Hotchkiss Wilson, the syndicate bought very little land. It was not their general policy to buy but to sell. William Hotchkiss Wilson, during his six-year stay in Alabama, found many desirable purchases on favorable terms and informed the members of the syndicate and urged them to buy, but in nearly every instance they refused, or some one or two members would refuse, and then the deal was off. In some instances certain individual members of the syndicate would purchase with the agent, and other instances, some combination of members, less than the whole, would purchase. At times the opportunity to purchase was so favorable, and William Hotchkiss Wilson was so anxious to purchase for the syndicate, that his appeals to the members amounted almost to a frenzy, but, notwithstanding these, in most instances, his appeals were denied. During the years William Hotchkiss Wilson would now and then buy a small tract for himself or for his wife or for his son, I think, in some instances, he purchased tracts which he had submitted to the syndicate and they had refused to purchase. The individual lands went into the landbook kept by the syndicate at Evergreen, Alabama. This book was seen and examined by different members of the syndicate when they went south on a tour of inspection. The agent paid the taxes on the individual lands and then charged them to the individual owners as well as their proportionate share of the expenses and salary of the agent in looking after the lands. On two occasions when the syndicate made sale of 20,000

acres to the Dunham Lumber Company and Conecuh Land & Lumber Company, they included in the sales some of the agents' lands.    After the expenses were deducted from the proceeds the agent's proportionate share was turned over to him.    In some instances the syndicate bought lands of the individual owners, and in some instances from the agents.    Abstracts of titles to the syndicate lands, including the individual lands, were made and from time to time turned over for examination to prospective purchasers.    These abstracts were copied into a book which was kept at the office at Evergreen.    This was open to the examination of the members of the syndicate.

It was the claim of the surviving member of the syndicate, Chester G. White, and the grantees of former members of the syndicate, that the syndicate was not aware of the individual purchases by the Wilsons until the year 1906.    Under their own concession at that time investigation was made by members of the syndicate to discover how many acres the Wilsons had acquired individually.    It was ascertained, and there was some discussion about making a demand on the Wilsons for a conveyance of the same to the syndicate, and one was finally made, but the Wilsons refused to convey.    The syndicate then concluded to wait until a sale of the entire tract was made and induce the Wilsons to include their lands with those of the syndicate, and after they had received the proceeds for the lands they would refuse to turn over to the Wilsons their share of it.    This course was followed nearly six years later and resulted in this litigation.

The record is filled with evidence that the syndicate knew of the purchases by the Wilsons and acquiesced therein.    No protest of any kind was ever made to the Wilsons buying all the lands they wanted to. Lands in that vicinity at that time were plenty.

Thousands of acres were for sale, at prices ranging from one to six dollars an acre. There was more land than the syndicate wanted and more land than both the syndicate and the agents wanted. There appears to be no good reason why the syndicate should have objected to the agents buying all the land they could pay for.

We find nothing in the conduct of either of the Wilsons indicating that their purchases conflicted with the rule of law which defendants seek to apply. Most of the purchases made by William Hotchkiss Wilson were made when the syndicate were not buying, and most of the purchases made by Samuel A. Wilson were made before he became agent. After dealing with the agents as the syndicate did, it is too much of a strain on our credulity to believe that the syndicate did not know and consent to their purchases. If they did know, and made no objection to it, they waived any right they might now have to object.

"Finally, it must be observed that, in any case in which the principal complains of the conduct or breach of loyalty of his agent, the principal cannot, even as against the agent, recover where he himself has consented to, waived or condoned the act." 1 Mechem on Agency (2d Ed.), § 1239.

So far as the record shows, the Wilsons were faithful servants. They worked hard and aggressively to serve the best interests of the syndicate and the syndicate profited by their services, and their profits would have been still greater if the advice of the Wilsons had been followed. There is very little basis in the record for the claim that the Wilsons were recreant to their trust.

While the chancellor was of the opinion that the syndicate knew and consented to the individual purchases by the Wilsons, he was also of the opinion, under their own concession, that they knew it as early

.as 1906, and that they did nothing thereafter for nearly six years toward asserting their rights, and that this delay amounted to laches upon their part and precluded them from raising the questions at this time.     We are in accord with these conclusions of the ·chancellor.

2. The questions of fraud charged by defendants in connection with the accounting of the agents have been so satisfactorily considered and disposed of by the chancellor that his opinion upon that branch of the case will be adopted as the opinion of this court:

"I have decided that no useful purpose would be served by my reciting the claims of the respective parties, as to each item in the accounting part of the suit.     Accounts were rendered by W. H. Wilson and S. A. Wilson on the 10th of each month, and letters written as to each trade.     In addition to all of this correspondence, and all of these statements, they frequently had meetings, and they met in 1906 when these parties and witnesses were alive.     They suspicioned S. A. Wilson at that time of crookedness. They could have asked him then to save his checks. I do not like the method or system used for keeping the books, and the bank accounts, but it was a system they used from the start and was known and not objected to by the members of the group.     I do not like it because the checks were destroyed, but I find no evidence that they were destroyed for any malicious or fraudulent or wrongful purpose.     It was simply a custom of W. H. Wilson and S. A. Wilson to clean out their desk and destroy their checks before coming north.     They could have requested more specific statements, but instead Mr. White, at least, informed them that their way of reporting was O. K.     They made no criticism until after this suit was started. They made no demand for an accounting.     There was no suggestion of this kind until it appeared in the cross-bill of this case.     No objection was made to these accounts that were rendered on the 10th of . each month until the filing of the cross-bill in this suit.     I believe that under the authorities, these accounts rendered became accounts stated.     Accounts

stated may be attacked upon the ground of fraud or mistake, but the burden in such cases is upon the attacking party. I do not believe that these defendants and cross-complainants have sustained this burden. Mr. Floyd A. Wilson has gone through all of these transactions, running back through a great many years, and in each item has asked for the difference between the amount charged and placed in these accounts rendered, and the amount paid the owner of the lands, or the consideration named in the deed, etc. In each case S. A. Wilson has testified, and this has been corroborated in a great many instances, by Mr. Rabb, and Johnny Brooks, showing where this difference went, showing that in every case it was used for the benefit of the company, and this testimony, or answer to these charges, has not been met or contradicted in any way by these cross-complainants. The cross-complainants, therefore, have not only not succeeded in bearing the burden, but the plaintiff and cross-defendants have established to my satisfaction, the correctness of the accounts as rendered. From the very nature of the case, Floyd A. Wilson's testimony, and his claim in many transactions was theory or conjecture as against real testimony upon the other side. They theorize or imagine or conjecture a great many things that are not backed up with testimony, but which are met with testimony.

"There was considerable ridiculing of Johnny Brooks before he appeared upon the witness stand. He made a very favorable impression upon me, however. His demeanor upon the stand was that of a truthful witness; his answers were quick, right to the point, and at no time given in a hesitating manner. I saw no evidence of crookedness on his part or perjury. His testimony was very important and corroborative of other evidence in many particulars. His memory was exceptionally good, and he seemed to have clearly in mind the details of every transaction in which he took part. I am also satisfied that he rendered a valuable service to the company, and that he was not overpaid.

"As stated during the hearing, I am satisfied that W. H. Wilson should be commended rather than criticized for securing the services of Johnny Brooks, Mr. Rabb and others to help pull off these various deals

for the benefit of the company. That is the only way he could have worked successfully in the south at that time. He would not have been able to have made these deals alone, and the company, therefore, would not have profited as much as they did.

"The same is true as to Mr. Rabb. He impressed me as being a man of ability and integrity. His answers, also, were clear, right to the point, and he also had a good memory as to each of the transactions in which he took a part. I cannot see anything to the contention that because he accepted a $25 a year retainer fee, that he was precluded thereafter from buying any lands or selling any lands to this group. He was practicing law and buying and selling lands before he ever did anything for this group, and it was never expected or intended that he would give up his business for $25 a year. I see nothing wrong that he did in any transaction in which he was involved. He sold some lands that he already owned to the group, bought some other lands, and sold them to the group at a profit, as he had a right to do. He at no time overcharged them. They only paid him the market price. He never made any large amount out of any of his sales, and he gave them an option known as the Bowles & Rabb option, at a low figure and for about half what they were selling some of their lands for. I believe that he had a right to buy and sell as he did, that W. H. Wilson received no part of his profits, and that each item claimed in each transaction in which he was involved should be denied, and I so find.

"There are a series of claims in which the amount claimed is the difference between the amount charged and reported and the amount paid to the vendor, or prior owner of the land. I believe that this difference was accounted for in each instance by showing that it was used in paying Brooks and Cobb, and these different ones who helped put through these deals, and in paying attorney fees, and other costs and expenses in securing title, and I so find.

"There is another group of claims which consist of the difference between the amount charged and reported and the consideration named in the deed. It is very evident that the consideration named in the deed was lowered for the purpose of keeping their

taxes down, and I believe that this accounts for this difference in those cases, and I so find.

"Counsel for cross-complainants take the broad position that they are entitled to the difference asked for, no matter if this money was used for the benefit of the company. This is well illustrated in the $15-item for the turpentine boxes. When it was shown clearly what this was used for, and that it was for the purpose of protecting their property from fires, I asked them if they expected me to decree this money over if I believed and found that it was so used for the benefit of the company. They said, yes, they wanted this, and every other item, decreed to them, whether it had been used for the benefit of the company or not, on the theory that it should have been itemized in the report and it was not. I cannot agree with them in this contention. They were not interested at all in the question as to whether or not the money in dispute in any particular case in the accounting was really used for the benefit of the company. I think that is the only issue for me to decide, and I find that in every case the money was used for the benefit of the company as charged and as reported in these monthly accounts.

"For these reasons I do not see that anything is to be gained by going through all of these transactions, I believe 119 in all, setting forth the claim of the cross-complainants, and the difference asked for, the answer to the claim, and then finding that I believe the answer to the claim, and that the money was spent as shown, for the benefit of the company. I, therefore, find, generally, as to each transaction, that I believe the cross-complainant has failed to establish, by satisfactory proof, the items claimed in the accounting end of the suit, and that the plaintiffs and cross-defendants have furnished satisfactory proof showing that the money was properly used and properly expended, in each instance, for the benefit of the group, as charged upon the books of the company and reported in the monthly statements, and I therefore deny each and every claim and item in the accounting end of the suit."

In view of our conclusions on the two main questions it will be unnecessary to consider the other questions

discussed. We find nothing in them which calls for a reversal of the case.

If any questions should arise as to the rate of interest which should be paid by the Union Trust Company, as trustee of the funds, they may be raised and considered upon a settlement of the decree in this court.

The decree of the trial court will be in all respects affirmed, with costs to the plaintiff.

WIEST, C. J., and FELLOWS, CLARK, SHARPE, and STEERE, JJ., concurred. MOORE, J., did not sit.

The late Justice STONE took no part in this decision.