NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0029n.06

No. 13-1310

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Jan 15, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SPECTRUM CUBIC, INC., | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| GRANT PRODUCTS DE MEXICO, | ) | |
| S.A. DE C.V., | ) | |
| | ) | OPINION |
| Defendant-Appellant. | ) | |

BEFORE: COLE and CLAY, Circuit Judges; BERTELSMAN, District Judge.[*]

PER CURIAM:

Defendant-Appellant Grant Products de Mexico, S.A. de C.V. ("Grant") appeals the district court's grant of summary judgment in favor of the Plaintiff-Appellee Spectrum Cubic, Inc. ("SCI") on its account stated claim and on Defendant-Appellant's tortious interference counterclaim.

SCI's account stated claim presents no genuine issue of material fact and the undisputed facts show that Grant agreed to the debt, actually paid a portion of the debt, and has refused to pay the balance. Further, Grant's tortious interference counterclaim presents no genuine issue of material fact and fails because SCI has shown a proper business motive. Therefore, we **AFFIRM**.

---

[*]The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

No. 13-1310
*Spectrum Cubic, Inc. v. Grant Products de Mexico, S.A.*

## I.  Jurisdiction

The district court had diversity jurisdiction in this case pursuant to 28 U.S.C. § 1332.

This Court has jurisdiction to hear the present appeal pursuant to 28 U.S.C. § 1291.  Grant's

appeal was timely filed on March 8, 2013.

## II.  Facts and Procedural History

### A.  Account Stated[1]

SCI provides hydrographic film and activator for use in the production of parts for the

automotive and other industries, along with related consulting, management, and engineering

support.  Effective December 31, 2009, Spectrum Trim, LLC, Spectrum Texas, Inc., and Premier

Trim, LLC (collectively, "Spectrum Group") entered into a Joint Venture Agreement ("JVA") with

Grant and Grupo Empresarial Seser, S.A. de C.V. ("Seser"), to produce automobile steering wheels.[2]

Prior to the JVA, SCI was providing Spectrum Group with hydrographic film and activator, and

management services.

Kevin Bassett was the President of SCI and he is also listed on the JVA signature pages as

the President of all three companies in Spectrum Group.  Gina Triick was SCI's controller in 2010.[3]

Triick was also an accountant for the Spectrum Group corporations from 2009-2011.  Rob Wilder,

---

[1]A discussion of factual assertions by Grant, which are contradicted by the record, are deferred until the analysis section that follows.

[2]Kevin Bassett's affidavit states the effective date of the JVA is January 1, 2010, and the district court stated the same, but the JVA states the effective date is December 31, 2009.  This has no impact on the merits of the case.

[3]Triick later became SCI's Chief Financial Officer.

while an employee of SCI, was also the Vice-President of Sales and Engineering and a board member of Grant. Eric Martz was an employee of SCI and Grant. Bernardo Jimenez Arrieta was the Chief Financial Officer of both Grant and Seser. Julio Segovia Serrano ("Segovia") was the Chief Executive Officer and President of the Board of Directors of Grant. Finally, Javier Segovia Serrano was the President of Seser when the JVA was executed.[4]

The JVA gave Grant exclusive control over the joint venture's activities, including Spectrum Group. SCI continued providing Grant the same goods and services it had provided Spectrum Group before the JVA.

Grant agreed to pay $200,000 per year ($16,666.67 per month) for management services from SCI. The management services were mainly provided by Eric Martz and Rob Wilder. Grant also agreed to pay $1,361.30 per week for Martz's wages. Spectrum Texas also owed SCI $117,475.16, a debt Grant agreed to pay.[5] In total, from June 5, 2009 through November 30, 2010, Grant owed SCI $763,398.86.

Grant made five payments to SCI between July 9, 2010 and December 22, 2010, totaling $350,829.88, leaving a balance of $412,568.98. Grant's payments included two payments for

---

[4]The positions of these individuals are stated as they were at the time of the underlying events.

[5]As the district court correctly noted, Spectrum Texas's Unpaid Bills Detail account statement adds up to $118,321.76 and not the $117,475.16 that Triick states in her affidavit. Grant's Accounts Payable Aging Report, dated April 20, 2010, shows that Grant owed "Spectrum Cubic" $273,028.18, and that $118,321.75 of that amount was more than 90 days old, which is consistent with the amount in the Unpaid Bills Detail Account statement.

$5,207.44, one of $10,415.00 (that is $5,207 doubled), a payment of $60,000, and a final payment

of $270,000.

Kevin Bassett, SCI's President, sent Julio Segovia, Grant's President, a letter on December

15, 2010 with the title, "Re: Account Balance for Spectrum Cubic, Inc.," advising Segovia that

Grant owed SCI $682,389.56 as of November 30, 2010, and that SCI would not supply any

additional products or services to Grant until the balance was paid in full.[6]

Attached to the letter was SCI's invoice, detailing charges dating back to June 5, 2009 and

showing Grant's recent payments. The next day, Bassett sent Segovia another letter reminding him

Grant owed $682,389.56, which included the management services of Martz and Wilder.

On December 17, 2010, Segovia responded to Bassett's letters stating that Grant "will be

paying 270,000.00 dollars on Monday of next week, and during the second week of January of next

year, will pay 250,000.00 dollars, with the rest on the second week of February of next year." On

December 22, 2010, Grant wired $270,000.00 to SCI but failed to make any additional payments.

**B. Tortious Interference**

Grant decided to move its "Hydro" and "Varnish" production lines from Brownsville, Texas

to Matamoros, Mexico. The move required approval from Autoliv, Inc. ("Autoliv"), one of Grant's

customers, and General Motors. On December 9, 2010, David Senkin, Autoliv's employee who had

---

[6]The Court notes there is a discrepancy of $179.42 between Triick's remaining balance ($682,568.98) and Bassett's remaining balance ($682,389.56). The discrepancy derives from differences on Bassett's account statement and Triick's account statement on four dates (9/30/09, 7/31/10, 10/31/10, and 11/30/10) which total $179.42. However, this discrepancy is not material to the Court's analysis.

authority to approve or deny the line transfer, sent an email disapproving the move of the Hydro and Varnish production lines because he had concerns about product quality at the Matamoros, Mexico production plant.

### III. Account Stated Legal Standard[7]

This Court reviews a district court's grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008).

An account stated is defined as "a balance struck between the parties on a settlement." *Thomasma v. Carpenter*, 141 N.W. 559, 561 (Mich. 1913). Further, "where a plaintiff is able to show that the mutual dealings which have occurred between the parties have been adjusted, settled, and a balance struck, the law implies a promise to pay that balance." *Id.* To show charges and fees have become an account stated, a creditor must prove that the debtor "either expressly accepted the bills by paying them or failed to object to them within a reasonable time." *Keywell & Rosenfeld v. Bithell*, 657 N.W.2d 759, 777 (Mich. Ct. App. 2002) (per curiam).

Once an account stated is shown, it is conclusive between the parties "unless some fraud, mistake, omission, or inaccuracy is shown." *Davis v. Kramer Bros. Freight Lines, Inc.*, 130 N.W.2d 419, 421 (Mich. 1964). "Accounts stated may be attacked upon the ground of fraud or mistake, but the burden in such cases is upon the attacking party." *Unifund CCR Partners v. Riley*, No. 287599, 2010 WL 571829, at *3 (Mich. Ct. App. Feb. 18, 2010) (per curiam) (quoting *Wilson v. White*, 194 N.W. 593, 597 (Mich. 1923)) (quotation marks omitted).

---

[7]The parties make no arguments relating to choice of law issues. The district court applied Michigan law and the parties cite to Michigan law as controlling.

In contrast to an account stated claim, an open account claim is "[a]n account which has not been finally settled or closed" which means it is "an indebtedness subject to future adjustment, and which may be reduced or modified by proof." *Siciliano v. Mueller*, No. 222258, 2001 WL 1699801, at *2 (Mich. Ct. App. Dec. 28, 2001) (per curiam) (quoting BLACK'S LAW DICTIONARY 18 (6th ed. 1990)); *see also A. Krolik & Co. v. Ossowski*, 180 N.W. 499, 501 (Mich. 1920) ("An open account is one which consists of a series of transactions and is continuous or current, and not closed or stated.") (citation omitted).

An open account becomes an account stated when "the parties *assent* to a sum as the correct balance due from one to the other." *Kaunitz v. Wheeler*, 73 N.W.2d 263, 265 (Mich. 1955) (emphasis added) (quoting *White v. Campbell*, 25 Mich. 463, 468 (1872)). Whether this conversion has occurred depends upon the facts and "may appear by evidence of an express understanding, or of words and acts, and the necessary and proper inferences from them." *Id*.

## IV. Discussion of SCI's Account Stated Claim

The undisputed facts show that Grant agreed to the debt it owed SCI, that Grant actually paid a portion of the debt, and that Grant has refused to pay the balance. Further, Grant has failed to introduce any evidence showing fraud, mistake, omission, or inaccuracy in the debt owed. Grant makes conclusory assertions that it does not owe SCI anything and that SCI never provided any goods or services to Grant. However, the record does not support these assertions.

SCI presents a letter from Bassett to Segovia, titled "Re: Account Balance for Spectrum Cubic, Inc.," which states: "I am writing with reference to the account balance of **Grant Products De Mexico, S.A. de C.V. (Grant Mexico)** which is to **Spectrum Cubic, Inc.** For your benefit, a

6

copy of our statement is enclosed which shows a balance due of $682,389.56 as of November 30, 2010."

The letter attaches a Statement of Account on Spectrum Cubic, Inc. letterhead, lists Grant as the customer, and provides a comprehensive list of charges and credits to Grant's account with SCI. This letter and attachment clearly reflect a debt owed to SCI by Grant.

Bassett followed up the next day with another letter in which he reminded Segovia that Grant owed $682,389.56 to SCI, and that these charges included the cost for employees Wilder and Martz.

The very next day Segovia replied to Bassett that "Spectrum Grant will be paying 270,000.00 dollars on Monday of next week, and during the second week of January of next year, will pay 250,000.00 dollars, with the rest on the second week of February of next year." On December 22, 2010, five days after Segovia's email stating Grant's intention to pay $270,000.00 to SCI, Grant made a wire transfer to SCI for $270,000.00.

Segovia never disputed the amount owed or the amount previously paid on behalf of Grant. Instead, Grant began paying the debt, which acknowledges both the debt's accuracy and legitimacy. This undisputed evidence firmly establishes SCI's account stated claim.

SCI provides additional evidence of its account stated claim. Triick's affidavit and attached exhibits describe email correspondence between Triick and Marco Yee, Defendant's controller, between December 29, 2009 and August 11, 2010. These emails show charges to Grant and payment of those charges by Grant. Specifically, Yee sent Triick an email on April 21, 2010 detailing Grant's "Accounts Payable Aging" as of April 20, 2010.

7

This document shows Grant owed "Spectrum Cubic" $273,028.18, and that $118,321.75 was over 90 days old, which was the same amount Spectrum Texas, Inc. owed SCI pre-JVA. This document shows Grant agreed it owed SCI for pre-JVA liabilities, for post-JVA liabilities, and that Grant listed SCI as a supplier in its accounting system.[8]

Grant provides affidavits from Segovia, Grant's CEO, and Arrieta, Grant's CFO, that purport to contradict most of the evidence cited above. For example, Arrieta states: "Grant, however, never agreed to pay Plaintiff Spectrum Cubic, Inc. . . . anything;" "Grant did not assume the liabilities of the Spectrum Group to [SCI];" "[SCI] provided no goods or services to Grant . . . [goods and services] were provided by the Spectrum Group, and not by [SCI];" and "Grant has never received an invoice from [SCI], whether for goods or services."

Segovia makes some of the same claims in his affidavit, for example: "Grant never agreed to pay [SCI] anything . . . [SCI] has not provided Grant with any goods or services;" "The $270,000 and $250,000 payments I reference in that email are payments to be made to the Spectrum Group, and not to [SCI];" and "Grant did make a payment to the Spectrum Group in the amount of $270,000 . . . ." However, these statements are in direct conflict with Grant's own counterclaim, which states: "Also at the end of 2010, Spectrum [SCI] cancelled work it had in process with Grant, and Grant's business was damaged as a result."

---

[8]Arrieta, in his affidavit in reference to Grant's Accounts Payable Aging report, states: ". . . it includes a report for accounts payable for **Grant** in Matamoros, Mexico (identified in the file below the concept "Division" as "Mat"), and of the Spectrum Business in Brownsville, TX (identified in the file below the concept "Division" as "Bro")." Arrieta thus implicitly admits that Grant's Accounts Payable Aging report shows SCI was an account payable for Grant.

Thus, SCI must have been providing some good or service to Grant if its cancellation is alleged to have harmed Grant.

Grant's position is essentially that Spectrum Group, and not SCI, provided goods and services to Grant, and that Grant paid Spectrum Group by sending the money to SCI. Grant asserts it paid SCI, at the request of Spectrum Group, because after the JVA became effective, "all bank accounts of the Spectrum Group were part of the Purchased Assets (as defined in the JVA), and the Spectrum Group instructed Grant to make payments for hydrographic film, activator and Mr. Martz wages, into a bank account in the name of Cubic, but the payments were to the Spectrum Group."

The above affidavits fail to defeat summary judgment because the standard requires a *genuine* issue of material fact to exist. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Grant's position is consistently refuted by the record evidence, including its own counterclaim. The email from Bassett to Segovia clearly states that Grant owes SCI a specific sum of money, and presents the account statement (which is the final statement of all of the previous statements provided by Triick over the previous year), and Segovia responds to Bassett's email by detailing a payment plan, and Grant then pays SCI a portion of the money.

Grant's argument that it owes Spectrum Group money, and that it only paid SCI at Spectrum Group's request because Grant had control of Spectrum Group and its bank accounts, in accordance with the JVA, makes no sense.

9

If Spectrum Group had provided the goods and services, and Grant controlled Spectrum Group, why would Grant then pay $350,830 to a third party that has allegedly done absolutely nothing to benefit Grant? No reasonable jury could believe Grant's version of the story given the record evidence.

Thus, the district court correctly granted summary judgment on SCI's account stated claim.

Grant argues that Triick instructed Grant to pay SCI, and the fact that she made this instruction while being an accountant for Spectrum Industries, Inc.[9] and the Spectrum Group companies, is evidence of fraud or mistake. Grant never presented this argument to the district court, and it is therefore waived on appeal. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008); *United States v. Universal Mgmt. Servs., Inc.*, *Corp.*, 191 F.3d 750, 758 (6th Cir. 1999).

Additionally, Grant argues that the district court allowed new evidence to be introduced in SCI's reply memorandum and denied Grant a "full and fair opportunity to respond." However, the record shows no request by Grant to supplement the record, file a surreply, or any other affirmative step by Grant to respond to any new information supplied by SCI. Thus, the district court did not deny Grant an opportunity to respond because Grant never made such a request. Similarly, the failure to raise this argument with the district court waives it on appeal. *Scottsdale Ins. Co.*, 513 F.3d at 552.

Lastly, Grant argues that various JVA provisions and an executed Side Letter establish a genuine issue of material fact about whether Grant owes SCI anything, and that SCI was required

---

[9]SCI is wholly owned by Spectrum Industries, Inc.

to raise the account stated claim in arbitration. However, the undisputed evidence establishes the account stated claim as a matter of law, independent of the JVA and Side Letter. Segovia agreed to the amount Bassett presented and Grant began paying on that amount. Thus, the JVA has no impact on the account stated claim. In addition, SCI is not a party to the JVA, the JVA is expressly limited to the parties, and thus SCI is not bound by the JVA arbitration provision.

For all of the foregoing reasons, the district court's grant of summary judgment on SCI's account stated claim is affirmed.

## V. Tortious Interference Legal Standards

"The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996).

"To fulfill the third element, intentional interference inducing or causing a breach of a business relationship, a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification." *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010).

"To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. Where the defendant's actions were motivated by legitimate business

reasons, its actions would not constitute improper motive or interference." *BPS Clinical Labs.*, 552 N.W.2d at 925 (citations omitted).

## VI. Discussion of Grant's Tortious Interference Counterclaim

Grant alleges that SCI intentionally, improperly and wrongfully interfered with the contractual or business relationship or expectancies between Grant and Autoliv. Grant alleges it was damaged by the delay of the Hydro and Varnish production lines move because of SCI's alleged interference.

On appeal, Grant attempts to broaden its tortious interference claim to include other relationships discussed in Segovia's affidavit.[10] However, none of the parties referenced in Segovia's affidavit are mentioned in Grant's counterclaim. Thus, Grant has failed to state a proper claim as it relates to these additional relationships because they were not properly pled before the district court.

Grant's tortious interference claim fails the third element for at least two reasons. First, Grant fails to show that SCI engaged in activity that caused Autoliv to deny the line transfer to the Matamoros facility. Second, SCI had a legitimate business motive and its actions were thus not improper.

David Senkin, Autoliv's employee who had authority to approve or deny the line transfer, testified that the move was denied due to quality concerns, that Wilder (the SCI employee involved

---

[10]Grant also cites to paragraph 44 of its counterclaim which states: "Shortly thereafter, Spectrum, through Martz and Wilder, illegally and without proper authorization, entered the Brownsville, Texas facility for the purpose of attempting to find information that Spectrum might use against Grant in some fashion." However, it is unclear how this relates to relationships with which SCI allegedly tortiously interfered.

in facilitating the move) did nothing to interfere with his decision to withhold approval, and that he decided to deny the move as of December 9, 2010. Grant has presented an email from Senkin sent on December 17, 2010, stating:

> I understand from Rob [Wilder] that he has been ordered not to come to my facility to make a presentation on the move . . . . You must understand that there have been quality concerns with Epsilon, and I cannot afford even the smallest error!! Now Rob tells me he cannot support this meeting. Based on this, I can say you do not have my approval to move the Hydro Line or Varnish line.

Grant argues this shows that Autoliv refused to move the lines because Wilder would not attend the meetings and Wilder would not attend because SCI ordered him not to attend.

However, Senkin's deposition, and the email itself, both indicate that there were quality concerns stopping the move from being approved, not interference from SCI. Further, while Senkin stated that Wilder's absence from the meeting was a problem in his December 17, 2010 email, his decision to deny the move actually occurred prior to that date, on December 9, 2010. Thus, the undisputed evidence demonstrates that it was not SCI's alleged interference that caused the move to be denied but instead Autoliv's quality concerns about the Matamoros facility.

Grant also points to two documents that it argues show Autoliv's quality concern was a pretext for denying the move. Grant argues that Autoliv gave Grant a "green" rating for quality, and thus, any quality concerns must be disingenuous.[11] But this misrepresents the email and attached document. The email and document must be referring to the Brownsville, Texas plant because the quality ratings begin in December 2009 and run through November 2010. The email could not be

---

[11]SCI points out that even if quality concerns were a pretext for denying the move, that fails to show that SCI tortiously interfered with the relationship between Grant and Autoliv.

discussing the quality rating of the Matamoros facility because it was not open in November 2010. While there is disagreement over whether General Motors approved the move or only approved quality testing, such dispute is immaterial because it is undisputed that Autoliv also had to approve the move.

Moreover, even if the Court assumes that SCI's order to Wilder to cease supporting Grant was the reason Autoliv denied the move, and that Autoliv had no genuine quality concerns, Grant's claim still fails because SCI had a legitimate business motive to order Wilder to stop supporting Grant. Namely, Grant owed SCI $682,389.56 at the time and Grant's payment was late. SCI's decision to cease providing products and services to Grant because of Grant's large outstanding debt is a legitimate business motive. Therefore, Grant raises no triable issue on the third element of its tortious interference claim and the district court's grant of summary judgment in favor of SCI on Grant's tortious interference counterclaim was proper.

For the reasons stated, we **AFFIRM**.

14